**Modified and Affirmed and Opinion Filed November 30, 2022**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-20-00017-CR

### CLYDE EARL TAYLOR, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the 203rd Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. F18-75930-P

## MEMORANDUM OPINION

Before Justices Schenck, Smith, and Rosenberg[1]
Opinion by Justice Rosenberg

A jury found appellant Clyde Earl Taylor guilty of murder and assessed his punishment at 75 years' imprisonment. In three issues, appellant challenges the sufficiency of the evidence to support his conviction and punishment and requests reformation of the judgment. In a supplemental issue, appellant challenges the jury charge. We conclude that the evidence was sufficient to support the jury's finding of guilt and its failure to find that appellant acted under the immediate influence of

---

[1] The Hon. Barbara Rosenberg, Justice, Assigned. This case was submitted without oral argument. At the time of submission, Justice Leslie Osborne was a member of the panel. Justice Rosenberg succeeded Justice Osborne as a member of the panel after Justice Osborne's resignation from the Court. TEX. R. APP. P. 41.1.

sudden passion. We also conclude that appellant was not harmed by the charge error at the punishment stage. Accordingly, we affirm appellant's conviction and punishment. We sustain appellant's third issue, modify the judgment to reflect that the "Statute for Offense" is section 19.02(b) of the Texas Penal Code, and affirm the judgment as reformed.

## BACKGROUND

Appellant admittedly stabbed Briana Williams three times with his knife, and she died from the wounds. Appellant and ten other witnesses testified at trial to the relevant and largely undisputed facts.

At about 3:00 a.m. May 28, 2018, appellant picked up Williams, a prostitute, from a Shell gas station in Dallas where she stood with her coworkers Michelle Noland and Anndrea Hammons. Appellant had attended a party earlier that evening with his then-girlfriend Misty Basaldua, but the two had argued and appellant left the party alone. He was riding a friend's motorcycle, and had stopped at a strip club "to blow off some steam, and hang out," as he later testified. He then went to the Shell station for gas, and met Williams.

Appellant and Williams drove about a mile from the Shell station to a deserted parking lot at a stone supply company. Noland and Hammons could track Williams's location by an app they had downloaded on their phones. Noland became concerned when Williams had been gone more than an hour, and called to check on her. Williams responded that she was okay and would be back shortly. Thirty minutes

–2–

later, however, Noland saw the man who had picked up Williams driving by the Shell station on his motorcycle alone. Noland's phone showed that Williams was nearby, but Williams did not appear. Noland called their pimp, Arias Ellison, and they drove to Williams's last location. There they found Williams's body. Williams had no pulse and there was a lot of blood on her body and on the ground.

Noland called 911 but she and the others did not stay until police arrived. Dallas police officers Dustin Green and Michael Gonzales testified to their observations and investigation at the crime scene. There was a woman lying in the parking lot on her stomach. She appeared to be deceased. There were violent trauma wounds on her back and a lot of blood on her body and on the ground. There were trails of blood, a set of keys, what appeared to be a used condom, a shoe, and other items strewn nearby.

Homicide detective David Grubbs testified to his observations at the scene as well as his subsequent investigation. He located Noland and Hammons and contacted them. He obtained surveillance videos from the Shell station and stone supply company and searched for Williams's cell phone, missing from the crime scene. The videos showed Williams riding on the back of a motorcycle driven by another person. The second video showed Williams running away from where the motorcycle was parked. Another person was chasing her. Her chest was partially exposed, her wig was blowing in the wind, and she lost her shoes. There was blood dripping from her hand. The person chasing her then went back to the motorcycle

alone and rode off. The video also showed Ellison, Noland, and Hammons arriving to check on Williams, then leaving. No one else appeared on the video before the police arrived.

The Shell station video showed the initial contact between the suspect and Williams. The police released the video and obtained tips, leading to appellant's identification and arrest.

Appellant's wife Deauna Taylor recognized appellant in the video. She testified that although she and appellant were still legally married, they had been separated for almost ten years. She identified pictures of appellant's motorcycle and another motorcycle appellant was riding on another occasion a month after Williams's death. This second motorcycle was owned by James Tolley, who she was dating at the time of trial. Deauna[2] testified that at the time the pictures were taken, appellant had facial hair and his hair was down the middle of his back in a ponytail, but the next time she saw him, his hair was cut. Deauna also said that appellant had a habit of carrying a knife on his hip.

Deauna testified that appellant was riding Tolley's motorcycle in the Shell station video. He was wearing his distinctive leather vest from his motorcycle club, the Midnight Riders, with bright yellow patches and a Grim Reaper emblem. Deauna testified that appellant was the president of the Midnight Riders club, and he had

---

[2] We refer to Deauna by her first name to avoid confusion with appellant.

worn the vest for years. Deauna had a family member contact police, and she gave police the information when they contacted her.

Appellant's girlfriend Basaldua testified about the night of the murder and about appellant's arrest. She explained that on the night of the murder, she got a ride home from the party after appellant left. Appellant was not home when she woke the next morning and left for work. Appellant texted her that he lost his keys; she later identified the keys found at the murder scene as appellant's. She cooperated with the police when they came to arrest appellant, including telling police where to look for appellant's knives and specific articles of his clothing. She identified appellant in the screen shots taken from the Shell station video.

Dallas detective B.K. Nelson testified to appellant's arrest, Balsaldua's cooperation, and the clothing and knives police collected at appellant's home. Police obtained knives and sheaths in their search of appellant's home, as well as a motorcycle vest and T-shirt consistent with those worn by the suspect in the video.

Two forensic biologists testified at trial about DNA testing performed in the investigation of the case. Appellant was "included" as a contributor to samples taken from Williams's body and condoms found at the crime scene.[3] Dr. Jill Urban, a

---

[3] Angela Fitzwater, one of the forensic biologists who testified at trial, explained that scientists do not draw conclusions about whether the DNA on a particular sample is a "match" to a specific person. Instead, their conclusions are based on the probability of a person being a contributor to the sample. Persons are "included" or "excluded" as possible sources or contributors to a sample. As an example, Fitzwater testified that there was a "single source profile," that is, one person's DNA, on a condom from the crime scene, and she "included" appellant "with a statistic of less than 1 in 10 trillion." This statistic shows the probability that someone other than appellant, selected at random from the population, would have the same DNA profile, a probability of less than one in ten trillion.

medical examiner, testified about the three stab wounds found in Williams's autopsy. Two of the three wounds, in Williams's shoulder and upper back, were two and one-half inches deep. The third wound was three and one-half inches deep, into the left side of Williams's upper back, the lobe of her left lung, her left pulmonary artery, and the pericardial sack around her heart. These wounds also would have made it difficult to breathe, and Williams would have survived only a few minutes after their infliction. Urban testified that Williams's wounds were serious bodily injury and the knives in evidence could have caused Williams's injuries. Urban also opined that Williams died as a result of sharp force injuries and that the actions taken to create those wounds would be acts dangerous to human life.

After the State rested its case, appellant testified on his own behalf. He confirmed the events of the evening, including his argument with Basaldua, leaving the party, riding Tolley's motorcycle to the Shell station, picking up Williams, and going to the stone supply warehouse parking lot. He paid Williams $100 and put his wallet in the trunk of the motorcycle. Williams put the money in her bra, and they moved to a grassy area and had sex; appellant used a condom. Williams's cell phone rang repeatedly, interrupting them.

Appellant testified that he then passed out, asleep. When he woke up, Williams said his time was up and they needed to leave, but he offered her an additional $200 for another hour. Appellant got his wallet out of the motorcycle's trunk and put it in his pocket. Williams again put the money in her bra. Again

–6–

Williams's phone interrupted them, this time during oral sex. He felt Williams's hand going into his pocket for his wallet, and he pushed her away. But he testified that she overcame him by using a taser, and he feared for his life. He explained that he only stabbed Williams because she was attacking him. She ran away and he chased her to get his wallet back. He denied any intent to cause her serious bodily injury or death, but he acknowledged the depth of the wounds and that the three and one-half inch wound would have used almost all of his knife.

Appellant testified that Williams dropped his wallet as she ran. He picked it up and drove off on the motorcycle. He denied taking her phone, but admitted that State's Exhibits 82 and 140 showed his hunting knife and sheath that he used in the encounter with Williams. He did not learn that Williams had died until the camera footage from the Shell station was broadcast in an attempt to identify him. After his arrest, he voluntarily talked to Detective Grubbs, but he admitted lying to Grubbs several times.

Appellant testified that Williams's taser was not a police taser with prongs; it was a "box kind" used for self-defense that required "skin contact." Appellant conceded that Williams was only five feet two inches tall and 149 pounds, while he

was almost a foot taller and seventy pounds heavier, but he testified that she overpowered him with the taser and because she was "military trained."[4]

The trial court instructed the jury on murder, manslaughter, self-defense, and defense of property, among other matters. The jury found the defendant guilty of murder as charged in the indictment.

Five witnesses testified during the punishment phase of the trial. Deauna returned to testify that during the times she and appellant lived together, they had good times and bad times. In the bad times, "[t]here was violence involved." Appellant hit her for the first time when she was pregnant with their first child. They argued, and appellant "decided he was going to try to strangle me on the foot of the bed."

Another argument occurred on New Year's Eve in 2007. Deauna testified that "in the middle of a sexual situation," appellant "decided to answer the phone with another woman on the phone, and began speaking sexually with her while we were having sexual encounters, and I got really pissed off about it, and we argued, and it ended up in physical confrontation," with appellant punching her in the face several times and splitting her cheek. She testified that "[i]t really affected my life because

---

[4] Although the record includes references to Williams's "military service," no evidence was offered or admitted with any further information about the military branch she served in, how long she served, what rank she held, or what training she might have received.

I have a scar to this day from it"; "[h]is knuckle split my cheek muscle permanently underneath my right eye." She was too embarrassed to get medical help, however.

Deauna testified to another occasion when appellant "had come home from a couple of days of binging and being high," and was upset that Deauna "wouldn't let him sleep." Deauna was pregnant with their second child and needed him to get out of bed and get groceries for the children. Appellant "sat up in the bed and took his pocket knife, and said, I will slit your throat," their one-year-old daughter's throat, "and I will cut your stomach open and slit the baby's throat, if you don't shut up and leave me the f— alone."

Deauna testified that their children witnessed some of the violence in later years, and she described a time period in 2009 and 2010 that was particularly violent. In April 2010, police were called after an argument that began in the car. Deauna told appellant to slow down, and appellant gave her three or four "backhands to the side of [her] face," "ripped [her] glasses off [her] face, and broke them in half, and threw them out the window." When they arrived back to their apartment complex, appellant was "screaming and cursing me." He "pulled me out the passenger side, and proceeded to beat the crap out of me, and kicked me in my head, I believe six times with steel-toe boots on." She blacked out, then woke up "face down in a mud-filled ditch, half of my face buried." She testified that she got up and went to a neighbor's home, and the neighbor called police. The next day, she went to the hospital. She had bruises on her face and her rotator cuff was torn. On cross-

examination, Deauna admitted that she had not given any medical records to the prosecutor to present to the jury in support of her claims.

Basaldua testified to an incident when appellant came home "very drunk." She told him "it was stupid for him to ride his bike being that drunk, and he hauled off and hit me in the back of the head." He was wearing his "big chunky biker rings" when he hit her. She elbowed him in the jaw in return, then tried to get away, but "he punched me as hard as he could in the back of the head." She continued:

> I don't know how many times he punched me at that point, because I was struggling to stay awake and I remember I was screaming. And I remember leaning over the side of the bed, and all of a sudden he . . . grabs me by both shoulders and pulls me back and shuts me down onto the bed. And then proceeds to choke me. I believe he was trying to stop me from screaming. He's looking into my eyes, but I don't see anything there. And everything starts like I was about to pass out. And all of a sudden, he blinks and it's like he touched fire, he let me go. But I thought that was it. I was afraid of him since then.

After the State rested, appellant offered testimony from his niece that he was caring and supportive, helping her after an accident and often taking her to the park. Next, his sister testified that he was "loving and caring" and "a good person," and had been the victim of their father's physical and mental abuse. The abuse "affected him terribly." She never witnessed any altercations between appellant and either Deauna or Basaldua, and testified that they described appellant as a person "very different from the person I know." He and his children lived with her for a several month period without incident.

Appellant again testified. He explained that he was physically and emotionally abused as a child, and as a result, "I usually shy away from altercations." He continued, "It take[s] a lot for me to get to a point where I get physical with somebody. As a matter of fact, I usually like lock up, first thing that happens if somebody gets physical with me, my body can't move." He admitted, however, that he did "most of the stuff" described by Deauna and Basaldua in their testimony.

Appellant also agreed with Deauna about the difficulties in their marriage that were exacerbated by both parties' substance abuse. But he testified that after they separated, he changed because he did not want to be like his father. He admitted the incident with Basaldua occurred after that point, but explained that he did not "know why he acted like that," and he "immediately stopped" when he "kind of snapped back to reality and realized what I was doing."

He admitted that he stabbed Williams. He testified it was an "impulse reaction" because she attacked him with a taser. He also admitted that he did not call 911 to assist Williams, but rode off on his motorcycle instead. He explained that he planned to turn himself in after seeing the Shell station video but wanted to attend a motorcycle club meeting first "to tell them that I was going to turn myself in and designate James Tolley as the president." He testified that he was arrested before he could carry out this plan.

The punishment charge included an instruction on "sudden passion," but the jury failed to find that appellant "caused the death of Briana Williams under the

immediate influence of a sudden passion arising from an adequate cause." The jury assessed punishment of 75 years' imprisonment. This appeal followed.

## ISSUES

In his first issue, appellant contends the evidence is insufficient to support his conviction for murder. He argues he was justified in using force and that the evidence shows he acted in self-defense or in defense of his property.

In his second issue, appellant contends the evidence is insufficient to support the jury's implied rejection of the claim that he was acting under the immediate influence of sudden passion arising from adequate cause.

In his third issue, appellant argues that the judgment should be reformed to properly reflect the statute for murder.

In his supplemental briefing, appellant contends the trial court erred by instructing the jury regarding good conduct time in the punishment phase of the trial.

We discuss the applicable standards of review in our consideration of each issue.

## DISCUSSION

### 1. Murder

Although appellant admits stabbing Williams, he contends the evidence is insufficient to support his conviction for murder. He argues that he did not intend to kill Williams, but merely reacted when she tased him while attempting to take his wallet. He argues that he feared for his life and acted in self-defense or in defense of

–12–

his property. In the alternative, he argues the evidence establishes that he acted recklessly and committed the offense of manslaughter rather than murder.

### *Standard of review*

In reviewing a challenge to the sufficiency of the evidence, this Court must examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Brooks v. State,* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson,* 443 U.S. at 319. The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State,* 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). The Court defers to the jury's determinations of credibility, and may not substitute its judgment for that of the fact finder. *Brooks,* 323 S.W.3d at 899. In conducting a sufficiency analysis, the Court considers all of the admitted evidence, whether it was admissible or inadmissible. *Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

### *Applicable law*

Penal code section 19.02(b) provides in relevant part that a person commits murder if he "intentionally or knowingly causes the death of an individual" or

"intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1), (2). Penal code section 19.04(a) provides that a person commits manslaughter "if he recklessly causes the death of an individual." *Id.* § 19.04(a); *see also id.* § 6.03(c) (defining culpable mental state for a person acting recklessly).

Chapter 9 of the Texas Penal Code addresses justification as a defense to a criminal prosecution. *See* TEX. PENAL CODE § 9.02 (justification as a defense). "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). Section 9.32(a) addresses when the use of deadly force, defined in § 9.01(3) as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury," is justified:

> 9.32 Deadly Force in Defense of Person
>
> (a) A person is justified in using force against another:
>
>> (1) If the actor would be justified in using force against the other under Section 9.31; and
>>
>> (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
>>
>>> (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or
>>>
>>> (B) to prevent the other's imminent commission of . . . robbery, or aggravated robbery.

TEX. PENAL CODE § 9.32(a).

Appellant also relies on penal code sections 9.41(a) and 9.42, regarding the use of force and deadly force to protect one's own property. Section 9.41 provides in part that a person in lawful possession of property is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate" the other's unlawful interference with the property. TEX. PENAL CODE § 9.41(a). Section 9.42 provides that a person is justified in using deadly force to protect property if he would be justified in using force against the other under section 9.41, and

> (2) when and to the degree he reasonably believes the deadly force is immediately necessary:
>
>> (A) to prevent the other's imminent commission of . . . robbery, aggravated robbery, [or] theft during the nighttime . . . ; or
>>
>> (B) to prevent the other who is fleeing immediately after committing . . robbery, aggravated robbery, or theft during the nighttime from escaping with the property; and
>
> (3) he reasonably believes that:
>
>> (A) the land or property cannot be protected or recovered by any other means; or
>>
>> (B) the use of force other than deadly force to protect or recover the land or property would expose the actor or another to a substantial risk of death or serious bodily injury.

*Id.* § 9.42. The Penal Code defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE § 1.07(a)(42).

In a claim of self-defense or defense of property that would justify a defendant's use of force, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues. *Braughton v. State,* 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State,* 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issues. *Braughton,* 569 S.W.3d at 608; *Krajcovic v. State,* 393 S.W.3d 282, 286 (Tex. Crim. App. 2013).

The State's burden of persuasion does not require the State to produce evidence; it requires only that the State prove its case beyond a reasonable doubt. *Zuliani,* 97 S.W.3d at 594. "Thus, in resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Braughton,* 569 S.W.3d at 609 (internal quotation omitted).

The issues of self-defense or defense of property are fact issues to be determined by the fact finder, who is free to accept or reject the defensive evidence. *Id*. As the sole judge of the weight and credibility of the evidence, the jury is free to

–16–

believe or disbelieve the testimony of all witnesses and to accept or reject any or all of the defensive evidence. *See id.* at 608–09. "A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Id.* at 609 (internal quotation omitted).

### *Discussion*

Appellant argues the evidence showed that Williams attempted to take his wallet and used a taser to do so. He argues that the taser incapacitated him, but when he recovered, he demanded the return of his wallet. But Williams instead "came running at me with the taser," according to appellant's testimony at trial. Appellant contends that he was in fear of his life, and stabbed her in self-defense or in defense of his property.

In the alternative, appellant argues that he "is guilty of, at most, manslaughter." He argues he acted recklessly by stabbing Williams and consciously disregarding the substantial and unjustifiable risk that Williams's death would occur. He contends that if we conclude the evidence was sufficient to prove the offense of manslaughter, we should remand the case for a new sentencing hearing, citing appellate procedure rule 43.2(d). *See* TEX. R. APP. P. 43.2(d) (court of appeals may reverse the trial court's judgment and remand for further proceedings).

The State responds that (1) the jury could have believed that Williams did not have a taser or other weapon with her that night because none was found at the scene and Noland testified that Williams did not have her taser with her; (2) even if

–17–

Williams had a taser, appellant described it as a civilian-style taser that required actual skin contact, and he was wearing a T-shirt, a long-sleeved shirt, long pants, and thick shoes; (3) the civilian-style taser was not deadly force in any event; (4) appellant was a foot taller than Williams and had a "significant size advantage" over her; (5) appellant had just paid Williams the $200 they agreed upon, so she had no reason to take his wallet; (6) she was wearing skimpy clothes and flip-flop shoes, making intent to rob a much larger man unlikely; and (7) the jury could have believed appellant was angry at Williams for the numerous cell phone interruptions or because he believed he was not receiving the sexual services he paid for. The State concludes that even if Williams charged him twice with a taser, it was not reasonable for him to stab her three times in the back to depths of two and a half and three and a half inches. Further, the State cites evidence that appellant took Williams's phone so she could not call 911, failed to obtain help for her, and fled the scene.

The State relies on several cases in support of its arguments. In *Gaona v. State*, 498 S.W.3d 706, 709–10 (Tex. App.—Dallas 2016, pet. ref'd), Gaona contended he acted in self-defense when he shot Jesse Benavides. Gaona asserted that he was "trapped" in his car when Benavides confronted him, demanded to fight, and then threatened to kill him while reaching for his hip pocket. *Id.* at 709. But other witnesses testified they did not hear Benavides threaten Gaona, and saw Gaona get out of his car and shoot Benavides seven times in the side and back. *Id.* at 710. Witnesses also testified that Benavides's hands were empty. *Id.* Viewing the

evidence in the light most favorable to the verdict, we explained that the jury could resolve conflicts in the evidence and conclude that Gaona "never believed deadly force was immediately necessary to protect himself against any unlawful deadly force but that he was angered when Benavides cursed at him." *Id.* We concluded that a rational jury could have found beyond a reasonable doubt that Gaona murdered Benevides and also could have found against him on his claim of self-defense. *Id.*

In *Smith v. State*, 355 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd), as here, Smith admitted stabbing the decedent Anthony Hawkins in the course of a fight, but testified that he did so in self-defense. Smith testified that Hawkins attempted to stab him in the neck and he feared for his life. *Id.* Other evidence, however, "undermined Smith's defensive claims." *See id.* at 145–46. Other witnesses testified that Hawkins did not have a weapon and there were none at the crime scene. Witnesses also testified that Smith chased Hawkins and attempted to stab him again. *Id.* at 146–47. The court concluded that based on this conflicting evidence, the jury could have rejected Smith's claims of self-defense and found each element of the charged offense of murder beyond a reasonable doubt. *Id.* at 147.

Here, the only evidence that appellant was acting in self-defense came from appellant's own testimony. As such, his theory of self-defense was inherently a credibility question for the jury to resolve. The credibility of appellant's self-defense testimony was solely within the jury's province to determine, and the jurors were

–19–

free to reject it. *See Saxton*, 804 S.W.2d at 914; *see also Braughton*, 569 S.W.3d at 611–13.

Although unlike *Gaona* and *Smith*, there were no other witnesses at the scene when appellant stabbed Williams, the jury was free to believe the State's circumstantial evidence—including evidence that Williams had no taser and appellant's later reference to Williams as a "little girl"—and to disbelieve appellant's contention that he was justified in using deadly force in response to her attack. *See Braughton*, 569 S.W.3d at 608–09. We conclude that after viewing all the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt and also could have found against appellant on the self-defense issue beyond a reasonable doubt. *See id.* Accordingly, we decide appellant's first issue against him.

**2. Sudden passion**

In his second issue, appellant challenges the legal and factual sufficiency of the evidence "to support the jury's implied rejection of the claim that he was acting under the immediate influence of sudden passion arising from adequate cause." Appellant argues that his actions were caused by Williams's provocation. He contends her act of tasing him "would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." He argues that the jury "could subjectively decide"

that he killed Williams "while in an excited and agitated state of mind arising out of the direct provocation" of Williams tasing him.

*Applicable law*

At the punishment stage of a murder trial, the defendant may raise the issue as to whether he caused the death "under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE § 19.02(d); *Beltran v. State*, 472 S.W.3d 283, 289 (Tex. Crim. App. 2015); *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013). "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2). "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

"Neither ordinary anger nor fear alone raises an issue on sudden passion arising from adequate cause." *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). "'Sudden passion' requires first that the record contain objective evidence that direct provocation by the victim or someone acting with the victim occurred at the time of the killing." *Naasz v. State*, 974 S.W.2d 418, 423–24 (Tex. App.—Dallas 1998, pet. ref'd) (citing *Merchant v. State*, 810 S.W.2d 305, 310 (Tex. App.—Dallas 1991, pet. ref'd)). The record must also contain evidence from which the trier of fact "could subjectively decide the accused killed

–21–

the victim while in an excited and agitated state of mind arising out of the direct provocation." *Id.* at 424. "Evidence of prior provocation alone is not enough"; the provocation must be of such a nature that it elicits more than mere "ordinary anger." *See id.* at 423–24.

A defendant has the burden of production and persuasion with respect to his claim that he caused the victim's death under the immediate influence of sudden passion. *Wooten*, 400 S.W.3d at 605. When a defendant establishes by a preponderance of the evidence that he caused a victim's death under the influence of sudden passion, the offense level is reduced from a first-degree to a second-degree felony. TEX. PENAL CODE § 19.02(d); *Trevino v. State*, 100 S.W.3d 232, 237 (Tex. Crim. App. 2003).

### *Standard of review*

In reviewing an appellant's legal sufficiency challenge to evidence supporting an adverse finding on which he had the burden of proof, such as sudden passion, we apply the legal-sufficiency standard utilized in civil cases. *See Matlock v. State*, 392 S.W.3d 662, 667 & n.14 (Tex. Crim. App. 2013). We first search the record for evidence favorable to the finding, disregarding all contrary evidence unless a reasonable factfinder could not. *Id.* at 669. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law. *Id.*

In reviewing appellant's factual sufficiency challenge to the jury's negative finding of sudden passion, we consider all the evidence in a neutral light, bearing in mind that the trier of fact assesses the weight of the evidence and the credibility of the witnesses' testimony. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015); *Matlock*, 392 S.W.3d at 671. We will sustain a defendant's factual sufficiency challenge only if the verdict is so against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 671; *Ruiz v. State*, No. 05-17-00669-CR, 2018 WL 6261502, at *3–4 (Tex. App.—Dallas Nov. 30, 2018, no pet.) (mem. op., not designated for publication).

*Discussion*

In examining the record under the first prong of the civil legal sufficiency standard, we conclude that some evidence exists to support the jury's negative finding on the issue of sudden passion, for several reasons. *See Matlock*, 392 S.W.3d at 669. First, the jury was not required to believe appellant's testimony that he stabbed Williams as an "impulse reaction" after she attacked him with a taser. Instead, the jury could have believed Noland's testimony that Williams did not have a taser with her on the night she died, and credited the evidence that no taser was found by police at the crime scene.

Second, the jury was not required to believe appellant's testimony that he becomes incapable of defending himself when assaulted and shies away from

–23–

altercations due to the physical abuse he suffered as a child from his father. He testified that he "usually lock[s] up" and his body will not move when someone "gets physical" with him. But the jury heard evidence to the contrary. As we have discussed, Deauna testified that appellant had tried to strangle her, had threatened to slit her and their children's throats with a knife, had punched her in the face several times, splitting the muscle under her right eye, and had "beat[en] the crap" out of her, kicking her in the head with his steel-toed boots. Deauna testified that these arguments arose when (1) she complained about his intimate telephone conversation with another woman while engaged in a sexual encounter with her; (2) she asked him to get out of bed to go to the grocery store to get milk for their toddler; and (3) she told him he was driving too fast. Similarly, appellant punched and choked Basaldua when she commented that it was stupid for appellant to be riding his motorcycle while he was drunk.

Third, "adequate cause" for causing a death under the influence of sudden passion is defined with respect to "a person of ordinary temper." TEX. PEN. CODE § 19.02(a)(1). "Evidence of a cause which produced one of the listed responses in the accused because of the accused's susceptibilities is not enough unless the cause would also produce the response in an ordinary person." *Merchant*, 810 S.W.2d at 310. Even if appellant acted by "impulse" given his temperament and experience, the jury could have concluded that a "person of ordinary temper" would not have responded in the same manner, by stabbing Williams in the back three times to

–24–

depths of up to three and one-half inches. *See Naasz*, 974 S.W.2d at 423–24 (discussing mental state required for legally adequate cause).

Fourth, "[e]vidence of the accused's fear is not enough unless the cause of the accused's fear could produce fear that rises to a level of terror which makes a person of ordinary temper incapable of cool reflection." *Merchant*, 810 S.W.2d at 310; *see also* TEX. PEN. CODE § 19.02(a)(1). There was evidence that appellant was a foot taller than Williams, and he told police that the taser was not very strong. Further, the jury saw a video of appellant chasing Williams as she ran away, which the jury could have considered in weighing his claim that Williams was the aggressor.

Last, there was evidence that appellant was already angry by the time of his encounter with Williams, supporting a finding that his actions were not the result of immediate provocation. Earlier in the evening, appellant drank alcohol at a party and became angry at Basaldua. They fought, and he left the party alone. He went to a strip club and drank more alcohol before picking up Williams. Further, he testified that his sexual encounter with Williams was interrupted by text messages or calls on Williams's cell phone. He paid her for additional time which was similarly interrupted. The jury could have disbelieved appellant's testimony that Williams stole his wallet for more money, and, as we have discussed, could have believed that he became angry at Williams because of the interruptions or because of disappointment with the encounter, not because of Williams's use of a taser.

We conclude the record satisfies the first prong of the legal sufficiency standard of review because some evidence exists that appellant was not under the immediate influence of sudden passion arising from an adequate cause when he stabbed Williams. *See Moncivais*, 425 S.W.3d at 408. Therefore, we need not determine whether the evidence establishes the contrary proposition as a matter of law. *Id.*

Next, we consider appellant's challenge to the factual sufficiency of the evidence to support the jury's failure to find sudden passion. Appellant largely relies on his own testimony, discussed above, that he did not mean to kill Williams, but only responded to her attack with her taser. But as we have discussed, there was conflicting evidence whether Williams had a taser with her. Noland testified that Williams did not have a taser with her on the night she died. Appellant testified that she did. The jury was the sole judge of each witness's credibility on the issue, and was not required to believe appellant's contention that he acted in response to Williams's use of a taser. *Id.* at 409.

Also as we have discussed, the video from the crime scene showed Williams running away from appellant, with appellant in pursuit. Both leave the camera's range, then appellant returns alone and rides off on his motorcycle. And the evidence we have discussed above about the events of the evening and about appellant's temperament were largely undisputed. Appellant admitted not only his past behavior with Deauna and Basaldua, but also his anger and drinking in the hours before

meeting Williams. He admitted stabbing Williams; the only question for the jury was his intent in doing so. While the jury could have decided otherwise, we cannot say based on the evidence that the jury's finding of no sudden passion is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See id.* at 409. We decide appellant's second issue against him.

## 3. Charge error

After submission of this appeal, appellant requested leave to file a supplemental brief to raise a new issue. We granted appellant's motion, filed the supplemental brief, and permitted the State to file a response. In his supplemental issue, appellant contends the trial court erred "in instructing the jury that Taylor was entitled to good conduct time."[5] The State responds that appellant failed to object on this basis, and in any event did not suffer any actual harm as a result of the instruction.

The jury was instructed:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

---

[5] Contrary to appellant's statement of the issue, the trial court did not instruct the jury that appellant "was entitled to" good conduct time. As we discuss, the jury was instructed only that prison authorities "may award" good conduct time to a prisoner, but the jury was "not to consider" the possible award of good conduct time.

. . .

It cannot be accurately predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

**You are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant.** You are not to consider the manner in which the parole law may be applied to this particular defendant. (Emphasis added)

These paragraphs were quotations from code of criminal procedure article 37.07 § 4 as it existed prior to September 1, 2019. *See* Act of May 17, 2019, 86th Leg., ch. 260 § 1, 2019 TEX. GEN. LAWS 446–48. Appellant argues that effective September 1, 2019, that article was amended to delete mandatory instructions regarding good conduct time. *Id.* The amendments were in effect at the punishment phase of appellant's trial in November 2019. The first paragraph of the above-quoted language has been deleted from the statute, as have the references to good conduct time in the subsequent paragraphs. *See id.* The statutory language regarding parole law, however, has not changed. *See* TEX. CODE CRIM. PROC. art. 37.07, § 4.

We review alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). "Preservation of charge error does not become an issue until we assess harm." *Id.* at 743. The degree of harm necessary for reversal depends upon whether the appellant preserved error by objection. *Id.* Jury charge error requires reversal when

the defendant has properly objected to the charge, and we find "some harm" to his rights. *Id.* at 743–44. When the defendant fails to object, however, we will not reverse for jury charge error unless the record shows "egregious harm" to the defendant. *Id.*

Here, appellant did not object to the jury charge on the ground that it did not comply with article 37.07's newly-amended language. Consequently, if we conclude charge error occurred, then we review that error for egregious harm. *See Lehman v. State*, No. 05-19-01367-CR, 2022 WL 2155061, at *7 (Tex. App.—Dallas June 15, 2022, no pet.) (mem. op., not designated for publication).[6]

### *Existence of error*

We first conclude the charge contained language that the Legislature removed from article 37.07 in the 2019 amendments. *See* 2019 TEX. GEN. LAWS 446–47. The first paragraph quoted above, explaining that prison authorities may award good conduct time to a prisoner, has been deleted. *See id.* The references to "good conduct time" in the second and third quoted paragraphs have also been deleted. *See id.* As

---

[6] Without elaboration, appellant argues his counsel "objected to the language in the jury charge." He cites to pages in the record where counsel argued (1) the language regarding good conduct time was "going to spark some confusion," and (2) instructions on parole law should be omitted "because, the jurors have no bearing on the parole law." After the former objection, however, the trial court revised the charge to remove some of the objected-to language, after which counsel stated, "I think that sufficiently addresses our concerns." Regarding the latter objection, we note that the amendments to article 37.07 made no changes to the required instructions on parole law. Consequently, the trial court properly overruled appellant's objection on that ground. Appellant does not contend he objected on the ground he asserts in his supplemental brief, that "the Legislature revised the applicable mandatory instructions to require the trial court to remain silent about good conduct time credits." We therefore review appellant's complaint under the standards for egregious harm. And in any event, even if appellant's objections were sufficient, our review of the record does not show there was harm to appellant's rights. *See Lehman*, 2022 WL 2155061, at *7 (discussing "some harm" standard).

–29–

amended, the third paragraph now addresses only parole law. *See id.* Consequently, the charge did not comply with article 37.07's requirement that "the court shall charge the jury in writing" as set forth in the statute. TEX. CODE CRIM. PROC. art. 37.07 § 4(a).

### *Egregious harm*

Having found charge error, we next analyze whether that error caused appellant to suffer egregious harm. "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). Actual harm is established when the erroneous jury instruction affected "the very basis of the case," "deprived the defendant of a valuable right," or "vitally affected a defensive theory." *Id.* (internal quotations omitted).

We examine four factors to determine whether an appellant was egregiously harmed by an erroneous jury instruction. *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Those factors are (1) the entire jury charge, (2) the state of the evidence, including contested issues and the weight of probative evidence, (3) the parties' arguments, and (4) all other relevant information in the record. *Id.* This analysis is fact-specific and is done on a "case-by-case basis." *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013). Examining those factors, we conclude appellant was not egregiously harmed.

We first consider the entire charge to the jury in the punishment phase of the trial. *See Arrington*, 451 S.W.3d at 840. Although the charge contained language about good conduct time that was no longer required under article 37.07, it also instructed jurors that they were "not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant." The charge correctly instructed the jury on the matters to be considered in deliberations, the burden of proof, and the requirement of unanimity. It provided a verdict form on which the jury could find in appellant's favor on his sudden passion defense. The error was not relevant to appellant's sudden passion defense; it related only to the sentence imposed. Further, absent evidence that the jury was actually confused by the charge, we assume the jury followed the trial court's instruction that it was "not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant." *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). There is no evidence of jury confusion. The jury did not send any notes or questions expressing confusion about good conduct time or its application.[7] The charge correctly instructed the jury regarding the range of punishment. The jury assessed appellant's punishment at imprisonment for 75 years, not the maximum

_____

[7] The State also cites to appellant's attorney's statement to the jury panel during voir dire about parole after explaining that the punishment range was 99 years to life: "[W]e aren't ever able to address parole laws because we have zero influence on those. Okay. That's the parole court. So just assum[e] that whatever you have sentenced that person to[,] they will serve . . . ."

punishment of 99 years. We conclude the first factor weighs against finding egregious harm.

We next consider the state of the evidence. Under this factor, we determine whether the evidence made it more or less likely that the charge error caused appellant actual harm. *Lehman*, 2022 WL 2155061, at *9. We must determine "the likelihood that the jury would in fact have reached a non-unanimous verdict on the facts of this particular case." *Id.* (internal quotation omitted). As we have discussed, the evidence at the punishment phase focused on appellant's sudden passion defense and turned on the witnesses' credibility regarding whether appellant caused Williams's death "under the immediate influence of sudden passion arising from an adequate cause," as stated in the verdict form. The evidence focused on appellant's violence toward Deauna, Basaldua, and Williams. The sentence the jury imposed is less than the life sentence the State encouraged the jury to assess. No evidence was offered regarding possible parole or good conduct time. We conclude the state of the evidence made it less likely that the jury charge caused appellant actual harm. Consequently, this factor weighs against finding egregious harm. *See id.*

Next, we consider whether any arguments made by the State, appellant, or the trial court during the trial exacerbated or ameliorated error in the charge. *Id.* at *10. Again, no mention of parole or good conduct time was made by the State, appellant, or the trial court except in the charge language quoted above. That language

instructed the jury not to consider the award or forfeit of good conduct time. We conclude this factor weighs against finding egregious harm. *See id.*

Last, we consider any other relevant information, such as whether the jury sent requests for clarification during deliberations. *See id.* The record reveals no jury notes or any other indication that the jury sought any clarification regarding good conduct time or parole. The final factor, therefore, does not weigh in favor of or against finding egregious harm. *See id.* at 10–11; *see also Addison v. State*, No. 05-18-01263-CR, 2020 WL 4251068, at *5 (Tex. App.—Dallas July 24, 2020, no pet.) (mem. op., not designated for publication) (noting that "there was no communication between the jury and the judge regarding the parole instruction or the possible application of parole law to Addison despite the charge's admonition not to do so" in concluding that fourth factor weighed against Addison's argument that he was egregiously harmed by the erroneous instruction mentioning good conduct time).

After considering and weighing all of the relevant factors, we conclude that the erroneous instructions regarding good conduct time did not cause actual harm to appellant. *See Lehman*, 2022 WL 2155061, at *11. Nor did the erroneous jury instructions affect "the very basis of the case," "deprive[ ] the defendant of a valuable right," or "vitally affect[ ] a defensive theory." *Cosio*, 353 S.W.3d at 777.

In so concluding, we distinguish this Court's opinions in *Shamburger v. State*, No. 05-20-00108-CR, 2021 WL 2430903 (Tex. App.—Dallas June 15, 2021, no

–33–

pet.) (mem. op., not designated for publication), and *Navratil v. State*, No. 05-97-01404-CR, 2001 WL 92688 (Tex. App.—Dallas Feb. 5, 2001, pet. ref'd) (not designated for publication), on which we relied in *Shamburger*. In *Shamburger*, as here, the jury was instructed on good conduct time after article 37.03 § 4(a) was amended to delete references to good conduct time. *Shamburger*, 2021 WL 2430903, at *7. But in *Shamburger*, "from the beginning of the prosecution, the State raised the issue of the impact of parole on appellant's sentence." *Id.* at *8. We explained that the jury had sent out a note inquiring about the appellant's payment of fines "during his parole," and concluded that "the jury was focused on the way parole and, by extension, good conduct time might impact appellant." *Id.* We cited cases for the proposition that "[w]hen there is a note from the jury regarding parole or good-conduct time, courts are more prone to find egregious harm." *See id.* Consequently, we concluded that "[u]nder the facts and circumstances of this case . . . the misstatement of the law concerning good conduct time was error and resulted in egregious harm to appellant." *Id.*

In *Navratil*, the charge erroneously instructed the jury that good conduct time would be counted in determining Navratil's eligibility for parole. 2001 WL 92688, at *2. Because Navratil pleaded guilty, the only issue for the jury was punishment. *Id.* at *3. We explained that "the jury was instructed, and thus had no choice but to believe, that Navratil would become eligible for parole when her actual time served, plus any good conduct time, equaled half of her sentence." *Id.* "The jury was

–34–

absolutely misinformed as to how the parole laws and good conduct time work, particularly with respect to this defendant." *Id.* *4. We explained that "[c]onsidering the particular procedural facts and circumstances of this case, we conclude it is one of those rare instances where erroneous jury instructions alone caused egregious harm." *Id.*

Unlike *Shamburger*, the jury in this case did not inquire about parole law or good conduct time. *Shamburger*, 2021 WL 2430903, at *8. Nor was parole law or good conduct time mentioned by counsel for either party in their arguments to the jury. *Cf. id.* Further, unlike *Navratil*, the charge did not misstate the application of parole law or good conduct time. *Cf. Navratil*, 2001 WL 92688, at *3–4. Although the instruction erroneously mentioned good conduct time, the former statutory language instructing the jury that "[y]ou *may* consider the existence of the parole law and good conduct time" was omitted, and the jury was expressly instructed that "[y]ou are *not* to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant." *See* 2019 TEX. GEN. LAWS 446–48 (emphasis added). We presume the jury followed this instruction. *Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003) ("We presume the jury follows the trial court's instructions.").

For these reasons, we decide appellant's supplemental issue against him.

## 4. Modification of judgment

Appellant requests modification of the judgment to reflect his conviction under penal code section 19.02(b), not section 19.02(c). The State agrees that the judgment should be reformed, but contends that the judgment should show not only that the jury convicted appellant of the offense of murder under penal code section 19.02(b) but also that the jury assessed a first degree punishment under section 19.02(c). *See* TEX. PENAL CODE § 19.02(b) (describing offense of murder); 19.02(c) (describing degree of offense).

The State contends that under code of criminal procedure article 42.01 § 1, the judgment must reflect both the offense and the degree of the offense for which appellant was convicted. *See* TEX. CODE CRIM. PROC. art. 42.01 § 1(13), (14) ("The judgment shall reflect . . . 13. The offense or offenses for which the defendant was convicted; 14. The date of the offense or offenses and degree of offense for which the defendant was convicted . . . .").

The judgment here, however, already reflects "Degree of Offense: 1st Degree Felony," in addition to citing section 19.02(c) as the "Statute for Offense." By reforming the judgment as appellant requests, article 42.01's requirements will have been met. Consequently, we sustain appellant's third issue.

This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Accordingly, we modify the trial court's

–36–

written judgment of conviction to reflect that the "Statute for Offense" is section 19.02(b) of the Texas Penal Code, and affirm the judgment as reformed. *See McDade v. State*, 613 S.W.3d 349, 358 (Tex. App.—Dallas 2020, no pet.) (reforming judgment to reflect statute for offense as penal code § 19.02(b)(1), not § 19.02(c)); *Jackson v. State*, No. 03-18-00417-CR, 2020 WL 2203306, at *4 (Tex. App.—Austin May 6, 2020, pet. ref'd) (mem. op., not designated for publication) (reforming judgment to reflect the statute for offense as penal code § 19.02(b)(1), "the statutory provision that defines the offense of intentional and knowing murder," rather than penal code § 19.02(c)).

## CONCLUSION

We modify the trial court's judgment and affirm the judgment as reformed.

/Barbara E. Rosenberg/
BARBARA ROSENBERG
JUSTICE, ASSIGNED

200017f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CLYDE EARL TAYLOR, Appellant

No. 05-20-00017-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 203rd Judicial District Court, Dallas County, Texas Trial Court Cause No. F-1875930-P. Opinion delivered by Justice Rosenberg. Justices Schenck and Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

The "Statute for Offense" is section 19.02(b), Texas Penal Code.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 30th day of November, 2022.